| | | |
|---|---|---|
| VINCENT LEUNG, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 15 C 03877 |
| v. | ) ) | Judge Edmond E. Chang |
| XPO LOGISTICS, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

After receiving a prerecorded-voice call inquiring about the quality of his IKEA furniture delivery, Vincent Leung sued the caller on behalf of himself and others similarly situated, arguing that the call violated the Telephone Consumer Protection Act, 47 U.S.C. § 227.[1] R. 1, Compl. The parties engaged in discovery and underwent mediation, and finally arrived at a proposed settlement agreement. After a hearing, the Court conditionally approved a class and granted preliminary approval of the settlement agreement. R. 141, 10/19/17 Minute Entry; R. 142, Order Granting Preliminary Approval. The settlement agreement (with minor adjustments agreed to by the parties, R. 143) is now before the Court for final approval. The Court held a fairness hearing on March 7, 2018. As discussed at that hearing, the motion for final approval of the settlement is granted; the only question remaining was the Plaintiff's motion for an incentive award and attorneys' fees. The incentive award is granted as proposed, and the attorneys' fees are granted in part

---

[1]The Court has subject-matter jurisdiction under 28 U.S.C. § 1331. Citations to the docket are indicated by "R." followed by the docket entry and page or paragraph number.

and denied in part. *See* R. 144, Mot. Fees. Attorney's fees will be limited to one-third of the settlement fund, net of administrative costs and the incentive award.

## I. Background

In April 2015, Vincent Leung (the named plaintiff in this case) bought two mirrors from the IKEA store in Schaumburg, Illinois. R. 157, Leung Dep. 20:2-5, 20:24-21:1. In a rush and with two small children in tow, Leung opted to have the mirrors delivered by IKEA's next-day delivery service. Leung Dep. 23:7-14. Leung's wife wrote down Leung's cell phone number on a form while he watched; Leung signed and initialed the form. *Id*. 25:24-26:18. The next day, Leung received an automated voice message and a text message notifying him that the delivery was imminent. Compl. ¶ 14. These messages came from Defendant XPO Logistics. Compl. ¶ 14. The mirrors were delivered without issue. Leung Dep. 32:5-11.

After the delivery, Leung received another call from XPO Logistics. Compl. ¶ 15. This call used a pre-recorded or artificial voice, and asked Leung to complete a survey regarding the delivery service. *Id*.; *see also* R. 157, IKEA Call Script. Irked by the post-delivery call, Leung complained to a friend, who referred Leung to the Keogh Law firm. Leung Dep. 15:23-18:12. Keogh Law filed a lawsuit on behalf of Leung, and sought to certify a class of similarly situated consumers. Compl. The complaint alleged that XPO Logistics violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, by making calls to cell phones "using [an] automatic telephone dialing system or an artificial or prerecorded voice" without express consent. *See* Compl. ¶ 33; 47 U.S.C. § 227(b)(1)(A).

The parties engaged in extensive and, at times, intensely disputed discovery. R. 56, 76, 83, 113, 127, 132; *see also* R. 149, Mot. Final Approval at 5. They also engaged in three mediation sessions in front of, separately, two former federal judges (Judge Wayne Andersen and Judge James Holderman), both of Judicial Arbitration and Mediation Services, Inc. (better known as JAMS). *Id*. The mediation sessions involved detailed argument and briefing. *Id*. After the third mediation session, the parties were able to reach an agreement. *Id*.

The proposed settlement agreement defines the settlement class as "the parties whose cellular telephone numbers are identified in the call data produced in this litigation … where XPO or its subsidiary placed a pre-recorded post-delivery survey call after May 1, 2011 relating to an IKEA delivery." Mot. Final Approval Exh. 1, Settlement Agreement § 2.25. The Settlement Agreement requires XPO to create a non-reversionary settlement fund of $7,000,000. Settlement Agreement § 2.34. Class members who file valid claims will receive cash payments from the fund. Settlement Agreement § 5.1. The Settlement provides for a robust notice plan and a streamlined claim process. *See* Settlement Agreement §§ 10.1-10.2. Any funds that cannot be feasibly distributed to class members will be donated to a *cy pres* recipient, the National Consumer Law Center. Settlement Agreement § 12.3.

Leung (through his counsel) also filed a motion for attorneys' fees, costs, and a service award. Mot. Fees. The motion seeks an incentive payment of $10,000 to Leung. *Id*. at 1. Leung's counsel, Keogh Law, Ltd., requests attorneys' fees of $2,333,334 (equal to one-third of the total settlement fund), plus compensation of

$52,458.90 for counsel's out-of-pocket litigation costs. R. 144, Mot. Fees at 1; Mot Final Approval at 11. The fees, costs, and incentive award would be taken out of the settlement fund. Settlement Agreement § 2.34.

## II. Analysis

## A. Class Certification

The first step in evaluating the settlement is to determine whether a class can be certified. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses *of a certified class* may be settled, voluntarily dismissed, or compromised only with the court's approval." (emphasis added)). To be certified, the class must meet the requirements of Federal Rule of Civil Procedure 23. *Harriston v. Chi. Tribune Co.,* 992 F.2d 697, 703 (7th Cir. 1993). Under Rule 23(a), the class must meet the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Additionally, the class must satisfy at least one of the conditions of Rule 23(b). Fed. R. Civ. P. 23(b); *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). In this case, the relevant Rule 23(b) requirement is that "the questions of law or fact common to class members" must "predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court will evaluate each requirement in turn.

## 1. Ascertainability

Implicit in Rule 23(a) is the requirement that the proposed class must be definite enough for the class to be ascertained. *Alliance to End Repression v.*

*Rochford,* 565 F.2d 975, 977 (7th Cir. 1977); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). In general, this means that a class must be clearly defined by objective criteria. *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 659-60 (7th Cir. 2015). Classes defined by vague or subjective criteria, or classes defined only in terms of success on the merits (so-called "fail-safe classes"), fail the ascertainability requirement. *Id.* The class definition in this case, however, does not suffer from any of those shortcomings. The class defined in the Settlement Agreement is "the parties whose cellular telephone numbers are identified in the call data produced in this litigation … where XPO or its subsidiary placed a pre-recorded post-delivery survey call after May 1, 2011 relating to an IKEA delivery." Settlement Agreement § 2.25. This class definition articulates an identifiable class of individuals who have been harmed in a particular, concrete way. The proposed class as defined by the Settlement Agreement satisfies the ascertainability requirement.

## 2. Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no bright-line test for numerosity, courts have long commented that a class of forty or more is enough to satisfy Rule 23(a)(1). *See, e.g., Swanson v. Am. Consumer Indus., Inc.,* 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 495 (N.D. Ill. 2008); *Fauley v. Drug Depot, Inc.*, 2018 WL 587150, at *4 (N.D. Ill. Jan. 29, 2018). At last count, the class in this case had 311,013 members,

Mot. Final Approval at 1 n.1—enough to make joinder of all members obviously impracticable. The numerosity requirement is clearly satisfied.

### 3. Commonality

Rule 23(a)'s second requirement is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is satisfied if the class members' claims "depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citations and quotation marks omitted). The common contention must be "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Commonality is satisfied in this case. All the class claims depend upon the common contention that XPO violated the TCPA by making an unsolicited, prerecorded survey call to the class members' cell phones following an IKEA delivery. Every one of the plaintiffs' claims rises and falls on the question of consent.

The TCPA unambiguously prohibits prerecorded voice calls to cell phones without consent, *see* 47 U.S.C. § 227(b)(1)(A), but the question of "consent" is tricky and context-dependent. The Federal Communications Commission (which has statutory authority to interpret the TCPA) has cautioned that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8769 (Oct. 16, 1992). But consent to be called for *one*

purpose is not necessarily consent to be called for *any* purpose. *See, e.g.*, *Blow v. Bijora*, 855 F.3d 793, 805 (7th Cir. 2017) (agreeing that "[c]onsent for one purposes does not equate to consent for all purposes"); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017) (holding that "transactional context matters in determining the scope of a consumer's consent to contact"); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1840 (Feb. 15, 2012). In this case, XPO Logistics would argue that the class members consented to the survey call when they agreed to give their phone numbers to facilitate delivery. *Cf., e.g.*, *In re GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*, 29 F.C.C. Rcd. 3442, 3443 (Mar. 27, 2014) (holding that consumers' consent to join a GroupMe text group constituted prior express consent to receive administrative texts related to the operation of that group). In response, Leung would argue that he consented to be called or texted only to the extent necessary to facilitate the IKEA delivery, and that any other calls exceeded the scope of that consent. If XPO prevailed on its consent argument, then each class member's claim would fail. Thus, all the class members' claims raise the same dispositive legal question, which satisfies the requirement of commonality.

### 4. Typicality

Next is the requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims

are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). In this case, each plaintiff's claim arises from the same event (a post-delivery prerecorded survey call) and the same legal theory (that the prerecorded call violated the TCPA because it exceeded the scope of the consent to delivery-related calls). Leung's claim follows the simple pattern of events articulated in the class definition (a post-IKEA-delivery call), and does not raise issues that would cause his claim to succeed or fail on unique grounds, separate from the claims of the rest of the class. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). In other words, Leung's claim is typical of the class claims.

## 5. Adequacy

Last up of the Rule 23(a) requirements is the rule that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). When evaluating adequacy of representation, courts consider "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the absentee members." *Sec. of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc). As already discussed, Leung is an adequate representative, because his claim is basically identical to the other claims in the class, without complicating factual issues that would lead to "antagonistic or conflicting claims." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). As for the adequacy of plaintiff's counsel,

Keogh Law (headed by lead counsel Keith J. Keogh) has extensive experience litigating TCPA class actions. *See* R. 144, Keogh Decl. ¶¶ 12, 15-16. As would be expected of competent and experienced attorneys, Leung's lawyers have vigorously litigated this case, including engaging in motion practice and substantial discovery efforts. Leung and his counsel are adequate class representatives.

### 6. Predominance and Superiority

As a final hurdle before class certification, the plaintiffs must show that they fit into at least one of the categories outlined in Rule 23(b). The 23(b) category that plausibly applies here is that "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3) (emphases added). The predominance requirement is similar to the commonality and typicality requirements, but "far more demanding." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997). Predominance is established if "common questions represent a significant aspect of [a] case and ... can be resolved for all members of [a] class in a single adjudication." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (quoting Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). The court should take a pragmatic view of the evidence and issues in the case, and "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016) (quoting *Waste Mgmt.*

*Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)). "Courts determine whether issues of individualized consent defeat commonality and predominance in [ ] TCPA cases on a case-by-case basis after evaluating the specific evidence available to prove consent." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 725 (N.D. Ill. 2016).

In this case, the predominance requirement is satisfied by the common question of law regarding the scope of the plaintiffs' consent to delivery-related calls. As discussed, there is no dispute that an unconsented-to call to a plaintiff's cellular phone using an automatic voice violates the TCPA. 47 U.S.C. § 227(b)(1)(A). But the question in this case is whether the plaintiffs' consent to receive calls related to their IKEA deliveries extended to a follow-up survey call about the delivery service. Of course, there might be some individual variation in the claims—perhaps some plaintiffs explicitly consented to a follow-up survey call—but Rule 23(b)(3) does not require that individual questions be *absent. Messner*, 669 F.3d at 815. It is enough that the common questions *predominate*, as they do here. *See, e.g., Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 492 (N.D. Ill. 2015) (holding that predominance was satisfied when there was a common question whether providing a cell phone number for identity verification purposes constitutes consent to receive prescription refill reminders); *Toney v. Quality Resources, Inc.*, 2018 WL 844424, at *17 (N.D. Ill. Feb. 12, 2018) (predominance satisfied by common questions whether "(1) a privacy policy hyperlinked to a website constitutes a person's consent to receive telemarketing phone calls if a person orders a product on that website; and

(2) providing one's cell phone number for questions about her order results in her consent to receive telemarketing calls unrelated to her order"). The same considerations also satisfy Rule 23(b)(3)'s superiority inquiry. Because the plaintiffs' claims all turn on the outcome of the same legal question, it makes sense to adjudicate the claims all at once, rather than having the hundreds of thousands of plaintiffs file individual cases.

In sum, the requirements of Rule 23 are met, so the Court certifies the class for settlement purposes.

## B. Settlement Approval

With a class certified, the next step is evaluation of the settlement agreement itself. Rule 23(e) permits settlement of a class action claim, subject to the Court's approval. If the proposed settlement would bind class members (as the settlement in this case does, *see* Settlement Agreement §§ 17.2-17.3), then the court may approve it only after a hearing and a finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court's approval is not a mere rubber stamp. In most cases, class members have little or no control over their attorneys, and thus no meaningful ability to make sure the settlement serves their interests. Recognizing this problem, the Seventh Circuit requires district judges to carefully examine proposed settlements for fairness, going so far as to describe the judge as "a fiduciary of the class." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 280 (7th Cir. 2002). In evaluating fairness, courts consider "the strength of plaintiffs' case compared to the amount of defendant's settlement offer, an assessment of the likely

complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs. Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

### 1. Strength of the Plaintiffs' Case

This first factor is the most important to the Court's analysis of the settlement's fairness. *Synfuel*, 463 F.3d at 653. The Court begins by estimating the "net expected value of continued litigation to the class, since a settlement for less than that value would not be adequate." *Reynolds*, 288 F.3d at 284-85. Although a "high degree of precision" cannot be expected, the parties must at least "present evidence that would enable" a fair "ballpark valuation." *Synfeul*, 463 F.3d at 653 (quoting *Reynolds*, 288 F.3d at 285).

In this case, XPO has made available a non-reversionary $7 million settlement fund, to be divided among around 311,013 class members. Of the class members, 42,715 had filed valid claims as of late February 2018. Mot. Final Approval at 3. Class Counsel estimates that each of the valid claims will be paid $100.81 once administration costs, attorneys' fees and costs, and the incentive award are deducted from the settlement.[2] Mot. Final Approval at 3. The $100 award is, of course, far less than the plaintiffs could receive if they prevailed at trial. The

---

[2]The precise calculations are as follows: ($7,000,000 - $298,321 - $2,333,224 - $52,458.90 - $10,000) ÷ 42,715 = $100.805. As will become clear, the awards to the claimants will actually be slightly larger because the attorneys' fees will be less than requested.

TCPA awards statutory damages of $500 per violation (or $1500 for each willful violation).[3] 47 U.S.C. § 227(b)(5). But the discrepancy between the TCPA's $500 damages award and the $100 settlement award does not necessarily render the settlement unfair. The *expected* value of continued litigation is far less than $500 per plaintiff. Statutory damages would only be awarded if the plaintiffs prevailed; otherwise, the plaintiffs would receive nothing. And in this case, there is a substantial risk that the plaintiffs would *not* prevail: the outcome of the consent issue is far from clear, so the plaintiffs would be rolling the dice by moving on to the dispositive-motion phase or by going to trial. The expected value of litigation must be discounted to account for the risk of failure.

In addition, both sides benefit from avoiding the "time, expense, and uncertainty of litigation." *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016). Although the parties have conducted substantial discovery, many hurdles still stand between the plaintiffs and final recovery. The parties would have to engage in disputed motion practice on class certification. The consent defense might have presented manageability concerns with class certification, because the specifics of how the plaintiffs agreed to delivery calls might affect the consent question. *See Wright v. Nationstar Mtg. LLC*, 2016 WL 4505169, at *9 (N.D. Ill. Aug. 29, 2016). What's more, the plaintiffs would probably face a summary judgment motion on the issue of consent, which would involve yet more expensive motion practice, and which would prolong the litigation for months. After all that

[3]Willfulness would be a hard sell in this case because of the ambiguity surrounding the consent issue, so the Court assumes that successful litigants would receive $500.

(assuming the claim survived), the plaintiffs would face the uncertainty and expense of trial, and then possibly an appeal. The entire process could take years, and the plaintiffs would not recover until the end (if ever). Both sides are essentially paying for the convenience of avoiding the risky, lengthy, and expensive process of litigation. This kind of exchange is "the essence of a settlement": both sides are giving up some rights and benefits in exchange for others. *See In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1135 (7th Cir. 1979). The overall settlement amount is fair when considered in the context of this litigation: the plaintiffs forfeit their chance at the full $500 (or $1500) statutory damages award, but gain certainty, avoid litigation costs, and recover now instead of years later.

## 2. Complexity, Length, and Expense of Litigation

As discussed above, continued litigation is likely to be lengthy, complex, and expensive. Even with some discovery out of the way, there might be continued discovery on class certification, which could be very expensive. *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,* 789 F.Supp.2d 935, 964 (N.D. Ill. 2011) ("The costs associated with discovery in complex class actions can be significant."). What's more, there would still be substantial motion practice on class certification and a possible summary judgment motion, plus trial and appeal. Both the class members and the defendant benefit from avoiding these expenses through a definite and immediate settlement.

### 3. Opposition to the Settlement

Not many class members have voiced opposition to the settlement, which is another factor in favor of settlement approval. (This factor is only mildly persuasive, because low opt-out and objection rates are common in relatively low-stakes TCPA cases. *See Wright*, 2016 WL 4505169, at *11.) Here, only 26 class members have opted out of the settlement, and only two objections have been filed. One class member, Mr. Richman, objects to the settlement because he thinks XPO did nothing wrong, so his objection does not raise questions about the fairness of the settlement to class members. *See* Mot. Final Approval Exh. 3, Richman Objection ("I think receiving an automated call after an IKEA delivery was entirely appropriate & expected … I do not think XPO should be required to pay this settlement."). The other objection, by Ms. Halsey, takes issue with the award of attorneys' fees, the incentive award, and the choice of a *cy pres* recipient. R. 148, Halsey Objection at 1-2, 6 n.5. This objection is discussed in more detail below. For now, it is enough to note that Ms. Halsey does not object to the overall amount of the settlement or the notice plan.

### 4. Opinion of Competent Counsel

Not surprisingly, Class Counsel strongly endorses the settlement agreement. Mot. Final Approval at 20. Even though Class Counsel is far from an objective observer—in fact, Class Counsel is the single greatest beneficiary of the settlement agreement—this factor still weighs in favor of settlement approval. *See In re Capital One Telephone Consumer Protection Act Litig.*, 80 F.Supp.3d 781, 792 (N.D.

Ill. 2015). Class Counsel has extensive experience litigating class actions, including litigating TCPA class actions in particular. Mot. Final Approval at 20. Class Counsel has also litigated this case for three years, and so is intimately familiar with the factual and legal issues in the case. Even more significantly, the settlement agreement was reached after three mediation sessions with two exceptional mediators, both of whom are former federal judges. *Id.*

### 5. State of the Proceedings and Amount of Discovery Completed

The last *Synfuel* factor considers the stage of the proceedings and the amount of discovery completed at the time of settlement. This factor is crucial because it allows the Court to evaluate whether parties have enough information to reach a fair settlement. *See Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). In this case, the parties engaged in substantial discovery, enough to ensure that the parties understood their relative legal positions before agreeing to a settlement. The Court denied a motion to bifurcate discovery, which would have limited initial discovery to Leung's claim and put off classwide discovery until after a summary-judgment motion. R. 52, Mot. Bifurcate Discovery; R. 55, 3/24/16 Minute Entry. Accordingly, the parties conducted early discovery on the merits and class certification, including taking fact and expert depositions, and seeking discovery from several non-parties. *See, e.g.*, R. 56, Joint Discovery Plan; R. 64, 06/08/16 Minute Entry; R. 76, 08/01/16 Minute Entry; R. 101, 11/14/16 Minute Entry; R. 113, 03/22/17 Minute Entry; R. 132, 07/07/2017 Minute Entry. As a result

of the discovery process, Class Counsel was able to obtain comprehensive records of the survey calls at issue, including the dates of the calls, the numbers dialed, and the names and addresses of the call recipients. R. 149-4, Keogh Supp. Decl. ¶ 4. By cross-referencing this information against cellular phone number databases, Class Counsel was able to determine which numbers were assigned to cellular phones at the time of the call. *Id*. It is not clear that more fact discovery would be useful (though if the settlement were to be rejected, XPO no doubt would seek more discovery on manageability): the major uncertainty in this case stems from the legal issue of consent, and the discovery that has already been conducted is enough to give both sides a fair idea of the potential scope of XPO's liability. The case is at a stage where the parties can appropriately value the litigation, and arrive at a fair settlement.

## C. Attorneys' Fees

Rule 23(h) allows the Court to award "reasonable attorney's fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In determining a reasonable fee, the court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988). When it comes to fees, there is a "built-in conflict of interest" between the class and their attorneys: the attorneys would naturally prefer to maximize their fees, but because fees come out of the same pot as the award to the class, the attorneys' interests are not aligned with their clients'

interests. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). Meanwhile, the defendants care only about their overall payout, not how the payout is divided between the class and class counsel, so the defendant cannot be relied on to guard the interests of the class. *Id*. This means that the Court must carefully evaluate any award of attorneys' fees in order to prevent unfair self-dealing by class counsel.

Moving on to the nitty-gritty of fee awards, the Court has discretion to choose between two methods of calculating a reasonable fee: (1) the lodestar method, which calculates fees based on number of hours worked; and (2) the percentage-of-recovery method, which awards a percentage of the common fund as a fee. *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994). The ultimate goal is to "recreate the market" and approximate the fees that the lawyer and client would have agreed to *ex ante* if negotiation with clients having a real stake had been feasible. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005); *In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741, 744 (7th Cir. 2011). The Court must consider factors such as actual fee contracts between plaintiffs and their attorneys, information from other cases, and data from class-counsel auctions. *In re Synthroid Marketing Litigation*, 264 F.3d 712, 719-20 (7th Cir. 2001) ("*Synthroid I*"). In this case, only the first two factors are relevant, because there are no relevant class-counsel auctions to look to. *See* Halsey Objection at 6 (agreeing that "counsel have apparently never bid to litigate a TCPA class action").

### 1. Determining Base Percentage

In this case, Class Counsel requests fees of $2,333,334 (around one-third of the gross settlement fund of $7 million), plus expenses of $52,458.90 (representing counsel's out-of-pocket costs like copying, legal research, and telephone costs). Mot. Fees at 1. As a starting point, the Court agrees that using the percentage-of-recovery method is preferable to the lodestar method. Courts have noted the difficulties of applying lodestar to class actions, where the normal practice is to "negotiate[] a fee arrangement based on a percentage of the recovery." *Capital One*, 80 F.Supp.3d at 795. This kind of fee arrangement has advantages over lodestar when there are many lightly damaged plaintiffs, because those sorts of plaintiffs have little ability to monitor counsel's performance to ensure that counsel does not wastefully inflate hours worked in order to obtain higher fees. *Id*; *see also* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements*, 1 J. Empirical Legal Studies 27, 31-32 (Mar. 2004) ("The percentage method is easy to calculate, does not involve the court in fee audits, and does not create incentives to waste time."). The percentage-of-recovery method also avoids the need to determine a "risk multiplier," which, as other courts have noted, can be an arbitrary process. *See, e.g.*, *In re Union Carbide Corp. Consumer Prods. Bus. Secs. Litig.*, 724 F. Supp. 160, 170 (S.D.N.Y. 1989) (commenting that multipliers "often seem to take on the character of so much Mumbo Jumbo").

Where the Court breaks from Class Counsel is Counsel's request to be awarded one-third of the *gross* settlement fund (that is, one-third of the full $7

million fund, without subtracting administrative costs and incentive awards). Using the gross fund to determine the reasonable percentage appears to conflict with the Seventh Circuit's pronouncement that "[t]he ratio that is relevant to assessing the reasonableness of the attorneys' fee … is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman*, 768 F.3d at 622; *see also Pearson v. NBTY, Inc.*, 772 F.3d 778, 780-81 (7th Cir. 2014). According to *Pearson* and *Redman*, the Court must deduct costs that do not directly benefit the class from the settlement amount when determining the reasonableness of the fee.[4] *Redman*, 768 F.3d at 630. The costs to be excluded include the cost of administering the fund, *cy pres* awards, and incentive awards. *See Capital One*, 80 F. Supp. 3d at 795; *Pearson*, 772 F.3d at 781. So in this case, the relevant denominator is actually $6,691,679 (which is $7 million less the estimated administrative costs and incentive award), not $7 million.[5] This means that Class Counsel is actually asking for about 35% of

---

[4]Class Counsel argues that *Pearson* and *Redman* are distinguishable from this case because *Pearson* and *Redman* did not involve non-reversionary funds. Pl. Resp. to Halsey Objection at 2-4. This argument is not persuasive. Nothing about the reasoning of *Redman* or *Pearson* suggests that non-reversionary common funds should be valued differently. *Redman* held that administrative costs are not a direct benefit to the class, and noted that attorneys would have a perverse incentive to inflate administrative costs to make their fee percentage look more reasonable. 768 F.3d 630. This is all equally true when the settlement pot is a non-reversionary common fund. So Class Counsel's attempt to distinguish *Pearson* and *Redman* is rejected. *See Capital One*, 80 F. Supp. 3d at 795 (rejecting an identical argument that *Pearson* and *Redman* do not apply to non-reversionary cash funds).

[5]$7,000,000 - $298,321 - $10,000 = $6,691,679. *See* Mot. Final Approval at 3. The Court does not subtract *cy pres* because the *cy pres* distribution is likely to be negligible, as it is comprised of only the leftover amount if distribution is unfeasible, as well as uncashed checks. *See* Section II.E, *below*.

the *net* settlement fund (that is, the fund less administrative costs and the incentive award).[6]

Class Counsel argues that the requested award is consistent with the market rate for legal services of this kind. First (and tracking the first *Synthroid* benchmark), Class Counsel points out that Leung's contract with class counsel provides for a contingency fee somewhere in the range of 33% to 40% of the "total recovery." Mot. Fees at 8-9. This information is helpful, but not highly persuasive. The Seventh Circuit has cautioned against over-reliance on fee arrangements between named class action plaintiffs and their lawyers when determining market rates. Named plaintiffs are often unsophisticated buyers of legal services, and likely to be "the cat's paws of the class lawyers." *Trans Union*, 629 F.3d at 744. To be sure, Leung is a lawyer himself, Leung Dep. 6:3-4, so he might be more sophisticated than the average consumer class-action plaintiff. But even so, Leung's expected damages award from this lawsuit was relatively low—only $500 or at most $1500— so Leung, like most plaintiffs in low-stakes consumer protection cases, did not have "a sufficient stake to drive a hard—or any—bargain with the lawyer[s]." *Capital One*, 80 F. Supp. 3d at 796 (citations and quotation marks omitted). So, although Leung's arrangement with Class Counsel is informative, the Court does not place too much weight on this piece of data. What's more, Leung's "total recovery" would presumably be his statutory damages in the event of victory. This number is not

---

[6]$2,333,334 ÷ $6,691,679 = .34869. This percentage does not count attorney costs. *See Pearson*, 772 F.3d at 780-82 (distinguishing between attorneys' fees and costs, and not considering costs when determining whether the fees were a fair percentage of the award to the class).

comparable to the total settlement fund, because the statutory damages represent money actually received by Leung, whereas the total amount of the settlement comprises both recovery to the class and other expenses that do not benefit the class. *See Pearson*, 772 F.3d at 781.

Class Counsel also argues that the requested fee award of $2,333,334 is appropriate because courts have historically awarded around one-third of the gross settlement fund. Mot. Fees at 7-8. To back up this assertion, Counsel cites a large number of pre-*Pearson* and *Redman* cases where judges in this district approved fee awards of one third or more of the gross fund. *See* Mot. Fees at 9-10 (collecting cases). But all of these cases predate *Pearson* and *Redman*, which directed district courts to focus on the *net* settlement award when evaluating attorneys' fees, not the *total* amount of the settlement fund. Counsel argues that the status quo persisted after *Pearson* and *Redman*, pointing to fee awards exceeding one-third in a number of recent cases in this district. But it appears that, since *Pearson* and *Redman*, courts in this district have generally used the *net* value of a settlement as a reference for awarding fees, not counting administrative costs and incentive awards. *See, e.g.*, *Capital One*, 80 F. Supp. 3d at 795 ("The court does not, however, agree with Class Counsel's assertion that 'it is appropriate—and the norm in the Seventh Circuit—to include administrative and notice costs when calculating fees based on a percentage-of-the-fund.'"); *Aranda v. Caribbean Cruise Line, Inc.*, 2017 WL 1369741, at *9 (awarding sliding-scale fees based on net settlement amount); *Allen v. JPMorgan Chase Bank, NA*, 13-cv-8285 (N.D. Ill. Oct. 21, 2015), ECF No.

93 ¶ 18 (awarding 33% of the settlement after deducting costs of class administration and service award); *Vergara v. Uber Techs., Inc.*, 15-cv-6942 (N.D. Ill. Feb 26, 2018), ECF No. 111 at 3-4 (awarding 30% of first $10M of net fund, plus a 6% risk premium); *Wright*, 2016 WL 4505169, at *13-14 & n.10 (awarding 30% of the net settlement); *Gehrich*, 316 F.R.D. at 237 (awarding 30% of the first $10 million of the net fund); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 503 (N.D. Ill. 2015) (awarding 30% of the net fund plus a 6% risk adjustment); *but see Wilkins v. HSBC Bank Nevada, N.A.*, 2015 WL 890566, at *9-12 (N.D. Ill. Feb. 27, 2015) (calculating fees on a sliding scale based on the gross settlement amount); *Ossola v. American Express*, 13-cv-4836 (N.D. Ill. Dec. 2, 2016), ECF No.. 379 at 5, ECF No. 362 at 1 (granting request for fees amounting to one third of the gross settlement fund); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *5 & n.2 (calculating fees on a sliding scale based on the gross settlement, but noting that the percentage of the net would be higher).

Class Counsel's citations to pre-*Pearson* and *Redman* cases do not help the court determine what the appropriate fee should be in this case. Most pre-*Redman* cases simply awarded a percentage of the *gross* fee award, without considering what the lawyer's share would be if administrative costs were deducted. The pre-*Redman* cases cited by Class Counsel certainly follow this pattern. *See, e.g.*, *Martin v. Dun & Bradstreet, Inc*, 2014 WL 9913504, at *3 (N.D. Ill. Jan. 16, 2014) (awarding 36.3% fee without discussing administrative and notice costs); *Hanley v. Fifth Third Bank*, 12-cv-1612 (N.D. Ill. Dec. 23, 2013), ECF No. 87 ¶ 14 (awarding fee without

discussing administrative and notice costs); *Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, 08-cv-5959 (N.D. Ill. Dec. 21, 2011), ECF No. 116 ¶ 12 (same). The Court cannot simply extrapolate from these pre-*Redman gross*-fund cases to arrive at a *net*-fund fee rate in this case. As Class Counsel says, treating net-fund and gross-fund awards as fungible is like comparing apples to oranges. *See* R. 151, Pl. Resp. Halsey Objection at 6. Administrative costs vary unpredictably from case to case, so the fact that an attorney received 33.3% of the *gross* settlement fund in one case does not tell the Court much about what percentage of the *net* fund the attorney should receive in another. Extrapolating from a sample of gross fund cases to a given net fund case simply does not work.

The facts of this case illustrate the conceptual problem. Class Counsel has requested 33.3% of the gross settlement fund of $7 million. But *Pearson* and *Redman* require the contingency to be calculated based on the benefit the clients actually receive—here, the net award of $6,691,679. Counsel's requested fee is around 35% of that net amount. But the Court cannot simply handwave the difference by saying that the historic gross-fund awards of around 33.3% probably translate to about 35% of the net settlement. In this case, 33.3% of the gross fee comes to 35% of the net, but in other cases, 33.3% of the gross fee could be 34% of the net, or 40%, or any other number. *See, e.g., Martin v. JTH Tax, Inc.*, 13-cv-6923, Motion for Final Approval, ECF No. 81 at 12 (N.D. Ill. Aug. 31, 2015) (noting that requested award of $1,000,000 in fees amounted to 33.3% of the gross fund and

approximately 38% of the estimated net settlement). Counsel has not provided any data to suggest that 35% is the right number, if such data even exists.[7]

The Court holds that a third of the net fund is a more appropriate award. As Class Counsel notes, a typical contingency agreement in this circuit might range from 33% to 40% of recovery. *See, e.g.*, *Retsky Family Ltd. P'ship,* 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33 1/3% to 40% of the amount recovered."); *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (noting that "the typical contingent fee contract is between 33 and 40 percent," though it might be smaller in large-recovery cases); *Kirchoff v. Flynn*, 786 F. 2d 320, 323 (7th Cir. 1986) ("40% is the customary fee in tort litigation"); *see also Matter of Cont'l. Ill. Sec. Litigation*, 962 F.2d 566, 572 (7th Cir. 1992) ("in personal-injury suits the usual range for contingent fees is between 33 and 50 percent"). A one-third award is in line with the Seventh Circuit's suggestion in *Pearson* that "attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." 772 F.3d at 782. A one-third fee is also similar to awards in a number of post-*Redman* and *Pearson* TCPA settlements.[8] *See, e.g., Allen v. JPMorgan Chase*

---

[7]Because the net fund is invariably smaller than the gross fund (assuming any administrative costs at all), the Court can safely say that a net-fund based award would always be a higher percentage than a gross-fund based award, but it is completely uncertain *how much* higher. Again, administrative costs can vary wildly from case to case—that was the exact problem in *Pearson*—so there probably is not a principled way to extrapolate a net-fund rate from historic gross-fund rates.

[8]This award is slightly higher than what courts have often awarded on the first $10 million of recovery. Courts in this district have tended to follow a uniform scale where 30% is awarded on the first $10 million, 25% on the next $10 million, and decreasing percentages on the rest. *Capital One*, 80 F. Supp. 3d at 804-05; *Aranda*, 2017 WL 1369741,

*Bank, NA*, 13-cv-8285 (N.D. Ill. Oct. 21, 2015), ECF No. 93 ¶ 18 (awarding 33% of the settlement after deducting costs of class administration and service award); *Vergara*, 15-cv-6942, ECF No. 111 at 3-4 (awarding 30% of first $10M of net fund, plus a 6% risk premium); *Gehrich*, 316 F.R.D. at 237 (awarding 30% of the first $10 million of the net fund). Taking all this into account, an award of 33.3% of the estimated net fund is reasonable and in line with the market.

## 2. No Risk Premium

Class Counsel argues that its requested award (35% of the net fund) is appropriate because of the risks involved in taking on this case. Mot. Fees at 12-17. These included the uncertainty surrounding the consent issue, as well as risks stemming from the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), which was pending when this case was filed. Additionally, when the suit began, Class Counsel did not know how large the class would be, and so potentially stood to lose if the class turned out to be smaller than expected (or worse, if it turned out to be uncertifiable because of problems of ascertainability or predominance, for example). The Court accepts that all these risks existed, but does not agree that they rendered this case risky enough to justify an enhanced fee award. As the Court noted in *Wright*, it does not make sense to apply risk premiums

---

at *9; *Wilkins*, 2015 WL 890566, at *10. But the difference is not crucial here. Many of the cases using the sliding scale are cases with very large settlement funds (above $10 million). *See, e.g.*, *Capital One*, 80 F. Supp. 3d at 789 (fund totaling almost $75.5 million); *Vergara*, 15-cv-6942 ($20 million settlement fund); *In re Synthroid Marketing Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) ("*Synthroid II*") ($88 million and $46 million funds). Lawyers would likely be willing to accept a slightly lower fee in cases where there is a chance of winning tens of millions of dollars.

in most percentage-of-recovery cases. 2016 WL 4505169, at *16. The *ex ante* market contingency rate in consumer class actions already builds in the risk of non-recovery, because "it is the rate that an attorney would set after assessing and quantifying the possibility that she could recover nothing for her time and effort." *Id*. It is of course possible that in unusually risky cases the attorney's predicted asking price would be higher, which is why some courts in this district have awarded 6% premiums in risky cases. *See Capital One*, 80 F. Supp. 3d at 807; *Kolinek*, 311 F.R.D. at 502; *Vergara*, 15-cv-6942, ECF No. 111 at 4. But this is not an unusually risky case. Most of the risks identified by Class Counsel—tricky consent issues, uncertainty about class size, the possibility of standing problems—are standard in TCPA cases.

Nor do the other factors cited by Class Counsel justify an above-market fee award. *See* Mot. Fees at 17-18. Counsel doubtless worked hard on this case, and performed well. But, as with the ordinary risks of non-recovery, counsel's hard work and good performance are already accounted for in the market contingency fee. The hypothetical fee would be negotiated with the expectation that counsel would work hard and perform well, so there should be no bonus for meeting those expectations. Similarly, although the stakes of this case were high because hundreds of thousands of class members were involved, *see* Mot. Fees at 18-19, that too is standard in TCPA cases, and is accounted for in the market rate.

In sum, the Court holds that one-third of the net fund is the appropriate fee award in this case. The Court therefore awards fees in the amount of $2,230,559.67,[9] and expenses of $52,458.90.

### 3. Halsey Objection

Ms. Halsey, the lone objector to the fee award, argues that even one-third is too high, because, she claims, the median fee for settlements between $4.6 and $9.8 million is 25%. Halsey Objection at 7. To support this claim, Halsey relies on *In re Capital One*, which examined a sample of TCPA settlements from around the Seventh Circuit and several other circuits. But, as the court in *Capital One* noted, this data is far from perfect, and the court's analysis in that case was informal and not detailed. 80 F. Supp. 3d at 800. And, more importantly, the sample of settlements in that case suffered from shortcomings that make it impossible to use the data to establish a reliable market estimate in this case. First, the *Capital One* data included 25 settlements from the Ninth Circuit, where the benchmark fee is set at 25%. *See In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("[C]ourts typically calculate 25% of the fund as the benchmark for a reasonable fee award, providing adequate explanation in the record of any special circumstances justifying a departure.") (cleaned up);[10] *Kolinek*, 311 F.R.D. at 501 ("[U]nlike the Seventh Circuit, the Ninth Circuit instructs district courts to calculate 25% of the common fund as the benchmark. … By contrast, a thirty percent fee award is not unusual in the Seventh Circuit in common fund cases.")

---

[9] Equal to $6,691,679 ÷ 3, rounded to the nearest cent.

[10] This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

(cleaned up). Halsey dismisses the inclusion of Ninth Circuit cases as insignificant, pointing out that "only" 25 of the settlements in the sample were from the Ninth Circuit. But 25 settlements is more than a third of the data set—easily enough to confound the data. What's more, the data suffers from the same gross-versus-net problem as the pre-*Pearson* settlements. In many cases, data about administrative costs was not available. But even so, the report concluded (based on the settlements with available data) that if notice and administration expenditures were excluded, the average fee award would be *44%* in the Seventh Circuit.[11] Corrected Declaration of Beth E. Terrell, filed in *Wilkins v. HSBC Bank Nevada N.A.*, No. 14-cv-190, ECF 109-1 ¶ 11. The *Capital One* data actually is a significant strike against Halsey's proposed 25% fee.

Halsey then argues that the market rate should be less than 25%, relying on an expert report by M. Todd Henderson, a professor at the University of Chicago Law School, who filed an expert report in *Capital One*. Halsey Objection at 10-11. Henderson was not qualified as an expert in this case, and the parties here had no opportunity to question him about his data and analysis, so the Court would not rely on his report even if it was relevant and useful. But in any event, Henderson's report would not shed much light on the appropriate fee in this case. Henderson proposes that "a properly risk-adjusted lodestar analysis approximates the percentage of recovery that would be reached in a competitive market for plaintiffs' lawyers services." Henderson Report ¶ 71. At some level, this is just common sense:

[11]The average fee award as a percentage of the net fund was similarly high for cases from other circuits: 43.84% for Ninth Circuit cases, and 45.52% for all cases with available information in the Second, Fifth, Seventh, and Ninth Circuits.

in a competitive market with perfect information, clients would pay attorneys what they need to make the attorneys' investment of time worthwhile, accounting for risk and all other relevant factors. Henderson then proposes a method for approximating the *ex ante* market rate based on lodestar data. *Id*. But, as the court in *Capital One* noted, Henderson's methodology does not square with the fee-calculation methods approved by the Seventh Circuit. 80 F. Supp. 3d at 808. The Henderson model also assumes a competitive market of homogenous plaintiffs' lawyers, and it is not clear that this assumption reflects the actual market for TCPA representation. *Id*. Accordingly, the Court gives no weight to arguments based on the Henderson report.

Next, Halsey argues that Class Counsel's requested fee should be lowered (again, to 25% or less) because Class Counsel did not disclose lodestar data. Halsey Objection at 10. According to Halsey, the Court should infer that Class Counsel is trying to hide the fact that its lodestar was actually very small. It follows, says Halsey, that Class Counsel is asking for more than they deserve. Halsey Objection at 11-12. Once again, Halsey's objection is out of step with the law of the Seventh Circuit. The Court has discretion to choose *either* the lodestar method *or* the percentage-of-fund method to calculate reasonable fees. The Court is not required to check its percentage-of-fee determination against the lodestar. *Williams v. Rohm & Haas Pension Plan*, 658 F.3d at 629, 636 (7th Cir. 2011); *see also Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.");

*Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014) ("[T]he choice of methods is discretionary … in our circuit, it is legally correct for a district court to choose either.").

The Court could, of course, choose to check its percentage-of-fund award against lodestar for reasonableness, *see, e.g.*, *Craftwood Lumber*, 2015 WL 1399367, at *5, but there is no compelling reason to do so here. It is not necessarily the case that disclosing lodestar information would provide much insight about the market rate. The lodestar information that counsel would provide—hours worked—would have to be adjusted by a risk multiplier to arrive at something approximating the market. As Halsey's counsel is no doubt aware, risk multipliers can be just as arbitrary as percentage-of-recovery fee awards, if not more so. *See, e.g.*, Eisenberg and Miller, 1 J. Empirical Legal Studies at 31 (noting that "the standards for determining any multiplier for the lodestar are unclear and potentially arbitrary"). In addition, as the Seventh Circuit has noted, a pay-by-the-hour arrangement does not make much sense in consumer class actions, which involve large classes of lightly damaged plaintiffs with little incentive to monitor their lawyers' hours worked. Percentage-of-recovery, as imperfect as it is, is still likely a better approximation of the hypothetical market than lodestar. So it is not clear that a lodestar cross-check would help the court arrive at a more accurate market approximation. The true source of Halsey's dissatisfaction appears to be the fact that counsel in consumer class action cases do not systematically provide lodestar information, which, she says, "has obscured the true market rate." Halsey Objection

at 12-13. That is an objection to the state of the law, not a principled argument to assign a 25% fee rate *in this case*.

Finally, the Court declines Halsey's invitation to reduce the fee award as a sanction for what Halsey characterizes as an "excessive" fee request. *See* Halsey Objection at 13-14. Counsel's request for 33.3% of the gross fund was not excessive, especially in light of the continuing uncertainty about the scope of *Pearson* and *Redman* and their impact on fee calculations. And even apart from this uncertainty, courts are not naïve. Counsel in class action settlements obviously have an incentive to argue for the highest fees reasonably possible; courts understand that and view their arguments with appropriate skepticism. If counsel truly steps outside the bounds of the legally defensible, then Federal Rule of Civil Procedure 11 is there as a backstop. Fed. R. Civ. Pro. 11(b)-(c). Ms. Halsey's objection is overruled, and the Court stands by its decision to award a third of the net settlement.

### D. Incentive Award

Class Counsel requests a service award of $10,000 for named plaintiff Vincent Leung. Mot. Fees at 1. "Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook*, 142 F.3d at 1016; *see also Synthroid I*, 264 F.3d at 722 ("Incentive awards are justified when necessary to induce individuals to become named representatives."). In determining the need for an award, the court can consider "the actions the plaintiff has taken to protect the

interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1004.

In this case, Leung retained counsel, was deposed, and participated in the litigation by helping Class Counsel investigate the case and reviewing and approving the proposed settlement. Mot. Fees at 19. The deposition took around three hours, and Leung met with his attorneys to prepare and review documents the day before the deposition. Leung Dep. 8:6-14. True, this is not a monumental effort, but it is more inconvenience than the average consumer would want to put up with in the absence of an incentive to do so. Leung's participation benefitted the class by allowing this case to be brought, which resulted in substantial settlement payouts to the class. The requested $10,000 award is also in line with the awards generally handed out in TCPA cases. *See, e.g.*, *Martin v. JTH Tax, Inc.*, 13-cv-6923 (N.D.Ill. Sept. 16, 2015), ECF No. 86 ¶ 21 (awarding $10,000); *Ossola v. American Express*, 13-cv-4836 (N.D. Ill. Dec. 2, 2016), ECF No. 379 ¶ 11 (same); *Martin v. Dun & Bradstreet, Inc.*, 2014 WL 9913504, at *3 (awarding $20,000). The motion to award $10,000 to Leung is granted.

### E. *Cy Pres*

Last up is the parties' choice of *cy pres* recipient. The idea behind the *cy pres* doctrine is that when it would be prohibitively cumbersome to distribute settlement funds (or the funds remaining after paying class members' claims), the remaining funds can be given to another beneficiary instead of reverting back to the defendant.

*Kolinek*, 311 F.R.D. at 498. Because "[m]oney not claimed by class members should be used for the class's benefit to the extent that is feasible," it is appropriate to select a *cy pres* beneficiary whose mission aligns with the goals of the TCPA. *See Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013) (rejecting a *cy pres* award because the proposed recipient, although "a worthy organization," did "not directly or indirectly benefit … the victims of [the defendant's] junk faxes").

In this case, the proposed settlement agreement provides that *cy pres* funds will be distributed only for uncashed or undeposited checks, and then only if a second distribution is not feasible. Settlement Agreement §§ 2.9, 12.2. A second distribution is considered feasible if there are enough funds left to pay at least $10 to each class member (excluding those who failed to cash their checks the first time around).[12] *Id*. § 12.2. The Settlement Agreement designates the National Consumer Law Center as *cy pres* recipient. *Id*. § 12.3. The funds are to be earmarked for safeguarding the protections of the TCPA. *Id*.

As the Court noted on the record during the approval hearing, the National Consumer Law Center appears to be a reputable nonprofit dedicated to consumer protection. According to its website, NCLC engages in substantial advocacy relating to consumer protection from robocalls and telemarketing. *See* https://www.nclc.org/issues/robocalls-and-telemarketing.html (last accessed May 28, 2018). NCLC's commitment to safeguarding the protections of the TCPA is also

---

[12]Ms. Halsey objected to these arrangements on the grounds that if fewer than 9,000 claims were received, a significant amount of the settlement might be diverted to the *cy pres* recipient. Halsey Objection at 14. But many more than 9,000 claims were filed, so it is likely that the *cy pres* distribution will not be large.

documented in the NCLC letter submitted along with the motion for final settlement approval, which gives examples of NCLC's TCPA-related advocacy. Mot. Final Approval Exh. 5 (noting, for example, that "NCLC has commented to the FCC on every major, and many minor, proceedings, rulemakings, and requests for exemptions under the TCPA"). The Court's independent search of filings with the Federal Communications Commission confirms that NCLC regularly engages in TCPA advocacy before the FCC. NCLC is also funded by reputable organizations, including the Illinois Office of the Attorney General and the W.K. Kellogg Foundation, which supports the finding that NCLC is a reputable nonprofit. *See* https://www.nclc.org/about-us/nclc-supporters.html (last accessed May 28, 2018).

Halsey objects that Class Counsel has "ties" to NCLC that render NCLC inappropriate as a *cy pres* recipient. During the final approval hearing, Ms. Halsey's counsel also pointed out that NCLC had been disqualified as a *cy pres* recipient in one case. But in that case, the court explicitly noted that NCLC "would normally be an acceptable *cy pres* beneficiary," and only disqualified it because class counsel's firm was co-counsel with NCLC in a different matter. In contrast, in this case, the connections between Class Counsel and NCLC are innocuous: Class Counsel has formerly worked with some of the lawyers involved in NCLC's "Partners Council"[13] and has spoken at some of NCLC's conferences. Lead counsel Keith Keogh was open

---

[13]This is an informal volunteer group which appears to fundraise for NCLC. It is not a direct part of the governance of the organization. *See* https://www.nclc.org/about-us/leadership.html#pc (accessed May 28, 2018) ("The Partners Council is an informal group that works with the National Consumer Law Center to ensure that NCLC has the revenue and resources to advance its work in support of economic fairness, equity, and consumer protection of low-income individuals and families. NCLC has a separate governing board of directors.").

about the fact that he has spoken at NCLC conferences. He was not paid to present at those engagements, and it is not surprising that NCLC would ask Mr. Keogh, who is an experienced TCPA litigator, to speak about the TCPA. Mot. Fees Exh. 1, Keogh Decl. ¶¶ 15-16, 33; Mot. Final Approval Exh. 4, Keogh Supp. Decl. ¶ 11. It is also not surprising that plaintiffs' lawyers working in the field of consumer protection would have connections to nonprofits doing similar work. It's also worth pointing out that Keogh Law *itself* is not a member of the Partners Council; the worst Halsey can say is that Keogh Law has worked with attorneys who are members of the Council. Nothing about these connections suggests that Class Counsel is trying to "curry favor" by designating NCLC as a *cy pres* recipient. *See* Halsey Objection at 15. The Court finds that the selection of NCLC as *cy pres* recipient is reasonable, and will tend to further the goals of the TCPA.

### III. Conclusion

For the reasons explained above, Plaintiff's motion for attorneys' fees is granted in the amount of $2,230,559.67, plus litigation expenses of $52,458.90. The motion for a $10,000 incentive award to Leung is granted. The Settlement Agreement is approved in its entirety, including the modifications outlined in the parties' Joint Stipulation to Modify Certain Settlement Terms, R. 143. The status

hearing of June 6, 2018 is reset to July 26, 2018, at 9:45 a.m., for a status on distribution of payments.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 30, 2018